# Exhibit 4



WORLD
ECONOMIC
FORUM

COMMITTED TO
IMPROVING THE STATE
OF THE WORLD

Global Agenda

# State of the Illicit Economy
## Briefing Papers

October 2015



# Contents

Foreword 3

Introduction 4

The State of the Illicit Economy 5

Implications for the agenda for combating illicit trade 6

Risk, Response, Innovation:
Human Trafficking and the Private Sector 8

Deep Dive: Analysis and Recommendations for Controlling
the Illicit Mining and Trading of Minerals 12

Endnotes 15

© WORLD ECONOMIC FORUM, 2015 – All rights reserved.

No part of this publication may be reproduced or
transmitted in any form or by any means, including
photocopying and recording, or by any information
storage and retrieval system.

REF 290915

# Foreword



Jean-Luc Vez
Managing
Director, Head of
Public Security
Policy and
Security Affairs
Member of the
Management
Committee,
World Economic
Forum

While the state of the global economy continues to fluctuate, its illegitimate counterpart, the illicit economy, has seen unprecedented growth. As such, it has etched its way into all aspects of society, and is cause for serious global concern. From healthcare to infrastructure to the arts, the illicit economy does not affect just one aspect of society, but all of them: business, government, civil society and individuals. It is a disruptor of social order to the greatest extent. A call to action must be made.

The illicit economy is formed from the proceeds of illicit trade which is, in turn, largely rooted in organized crime. Whether it is human trafficking, arms trafficking, the illegal wildlife trade, counterfeiting or money laundering, these activities are incredibly lucrative and fuel the magnitude of the illicit economy. Our Global Agenda Council on Illicit Trade 2012-2014 estimated the shadow economy to be worth $650 billion. More current research projects that the cost to the global economy of counterfeiting alone could reach USD 1.77 Trillion in 2015. With technological advancements and the international nature of trade in the world today, this value is expected to continue to rise.

Illicit trade operates on a vast scale and unprecedented pace, making it increasingly challenging to tackle. There are multiple initiatives and organizations, as well as public and private initiatives, dedicated to combating one or several aspects of illicit trade, but this is not a fight that can be won unilaterally. To achieve success, a global and multidisciplinary approach is needed in which the knowledge, expertise and experiences of various actors can be tapped into and shared.

As an international institute for public-private partnership, the World Economic Forum provides a neutral platform for parties to come together and discuss the issue of illicit trade. The aim is to foster structured dialogue between business, civil society and government so that common methods and solutions of tackling this trade can be found. Through multidisciplinary cooperation and joint action, results can be achieved. We can disrupt the proliferation of illicit trade, whether it is by simply raising awareness of the problem within affected communities, or by finding ways of detecting and preventing crimes that contribute to ruining the economy.

The World Economic Forum's Meta-Council on the Illicit Economy aims to take this principle of public-private cooperation forward. By engaging leading experts in the field, the Meta-Council will try to find viable multistakeholder solutions to limiting this criminal activity. This paper on the State of the Illicit Economy is the first step in the process. It sets out the parameters within which illicit trade operates, the contributing factors to illicit trade, the role that various societal sectors can play in the fight against it, and the types of solutions needed to combat it.

My thanks go to the members of the Meta-Council on the Illicit Economy for their cooperation and contributions, to Adam Blackwell for his leadership as chair of this Meta-Council, and to Karen Wong for her tireless coordination of these efforts as council manager. We hope this paper provides you with the valuable insight required to start a conversation to initiate change.

# Introduction



Adam Blackwell, Ambassador in Residence at the William Perry Center for Hemispheric Defense and Security Studies, National Defense University, USA

The illicit economy is vast and hampers the growth of the global economy while also jeopardizing the stability of society and governance. With estimations of various illicit activities running into billions of US dollars, these figures rival the GDP of some G20 countries. This cannot be neglected - the illicit economy and its related activities must be addressed.

By producing this paper, we the Meta-Council on the Illicit Economy, seek to shed light on the importance of this topic and the necessity for multiple stakeholders to engage in the fight as each have a role to play. Curtailing the illicit economy requires a range of solutions from technology to public policy. By addressing these points, the Meta-Council hopes to shed light on these issues and highlight the action that can, and should be taken to reduce the rates at which the illicit economy operates.

Numerous initiatives, enterprises and programs dedicated to the fight against illicit trade exist. They take many shapes and forms and involve a variety of actors. With the broad expertise of our council members, we strive to foster collaboration on countering the illicit economy and raise awareness on possible solutions.

The proliferation of illicit activities shows no signs of slowing. It grows particularly in regions where there is lack of governance and social structure. Hence, in an era where several regions in the world are vulnerable and politically unstable, efforts to address these underlying issues must be made.

## Special Acknowledgement on the *Deep Dive: Analysis and Recommendations for Controlling the Illicit Mining and Trading of Minerals*

This analysis and recommendations were prepared by Stephen D'Esposito and Herbert M'cleod on behalf of the Global Agenda Council on the Future of Mining and Metals. The Council drew on its membership and external experts. We would like to thank Bob Leet of Intel and Mike Loch, formerly of Motorola Solutions and currently a RESOLVE strategic partners, for their contributions as well as serving as reviewers. In addition to the members of Global Agenda Council on the Future of Mining and Metals (Huguette Labelle, Jamie de Bourbon, Antonio Pedro and Tsagann Puntsag) we would like to thank Eddie Rich of EITI, Tim Martin director of RESOLVE's Resource Diplomacy Initiative, Jennifer Peyser of RESOLVE, Lina Villa of the Alliance for Responsible Mining, Ian Smillie of DDI, Nick Cotts of Newmont, and Marcello Veiga of the University of British Colombia.

# The State of the Illicit Economy

The global illicit trade has grown at an unprecedented pace, in both relative and absolute terms, ushering in immense risks to society, governance and the global economy. Much of the illicit trade is opportunistic and thrives on gaps in capacity and vulnerabilities in policy regimes across countries and regions.

The international normative regime which governs the prevention and mitigation of illicit trade is multifaceted and constantly evolving. The variety of actors involved in its implementation at the national, regional and international level is inherently multidisciplinary.

Criminal organizations have not only exploited gaps in capacity and policy, they have been ahead of the curve in their use of technology and sophisticated instruments and schemes. They have used the interconnectedness of trade, finance, communication and transport systems that have affected innovation and growth in the private sector. Indeed, the very forces that enable globalization and that underpin secure, private trans-national commerce are the same as those that also now make us less secure.

The international framework in this area includes the 2003 United Nations Convention against Transnational Organized Crime (UNTOC) and the 2005 United Nations Convention against Corruption (UNCAC). UNTOC offers states a framework for preventing and combating organized crime, and a platform for co-operating. UNCAC's far-reaching approach and the mandatory character of many of its provisions make it a unique tool for developing a comprehensive response to a global problem. The 13th United Nations Congress on Crime Prevention and Criminal Justice, held in Doha, Qatar, in April 2015, adopted the Doha Declaration. This highlighted the way a lack of effective social crime-prevention policies and ineffective criminal justice systems allow crime, terrorism, and violence to hamper social and economic development.

### The need to tackle illicit trade has never been more urgent

The cost of illicit trade to the global economy is considerable, if difficult to state with absolute precision. Counterfeiting and piracy alone will cost the global economy an estimated $1.77 trillion in 2015[1], which is nearly 10% of the global trade in merchandise.[2]

The benefits of tackling illicit trade are as compelling for governments and citizens as they are for businesses. Eliminating the illicit trade in tobacco alone could generate annual revenues of up to $31 billion for governments, according to the World Health Organization.[3]

The cost of illicit trade to human life is even more striking. Sub-standard malaria medicines led to the deaths of over 120,000 children in sub-Saharan countries in 2013 alone,[4] while globally, an estimated 700,000 people die each year because of counterfeit malaria and tuberculosis medicines. Counterfeit rates across all sectors have historically run as high as 40% and even today are estimated at 17%.[5,6]

Human trafficking and smuggling are currently front-page news in Europe, but let us not forget that globally, nearly 21 million people are victims of forced labour, generating illegal profits of at least $150 billion.[7] This labour force is larger than the entire working population in countries such as Canada and Poland.[8]

### Criminal and terrorist networks profit immensely from illicit trade

ISIS is reported to be the world's richest terrorist organization,[9] funding itself not only through the illicit trade in oil but also through the sale of "blood antiquities".[10]

The illegal trade in wildlife and natural resources is worth up to $213 billion a year[11], - a sum that surpasses the $135 billion in official development assistance given globally in 2014[12] - and is funding global terror groups and militias.[13] But even these figures understate the total value of the proceeds of crime, estimated in 2009 by the United Nations Office on Drugs & Crime to be at 3.6% of global GDP, or $2.1 trillion.[14] This figure significantly exceeds the 2014 figure for combined global military expenditure, of $1.8 trillion.

INTERPOL recently formed a dedicated "Illicit Markets" sub-crime directorate to provide the world's law-enforcement agencies with access to expertise in this area, with particular focus on pharmaceutical crime, environmental crime, counterfeits and smuggled goods, as well as stolen vehicles and works of art.

# Implications for the agenda for combating illicit trade

## I. Assessing the magnitude of illicit trade

The scale of illicit trade, because of its secret and illegal nature, is difficult to accurately quantify. But even if precise assessments are elusive, it is nonetheless important to understand the orders of magnitude in order to broadly assess impact and to improve the effectiveness and targeting of policy.

The World Economic Forum's Global Agenda Council on Illicit Trade 2012-2014 is often cited[15] as the source that estimates the value of the "shadow economy" at $650 billion, a figure that rises to $2 trillion when money laundering is included.[16]

The $650 billion figure is drawn from Global Financial Integrity's 2011 study, which assessed 12 types of illicit trade to arrive at the aggregate figure. As the table below illustrates, the data on which these figures were based is clearly outdated. Moreover, the scope of these measures is rather limited. The OECD figures on counterfeiting, for instance, only capture the value of cross-border trade, excluding the significant counterfeit trade within countries such as China. They also measure the trade in tangible goods, but exclude the illicit trade in digital products and online services.

| Illicit activities (total $650 billion) | 2011 figures | Sources used by GFI for 2011 study | Years out-dated |
|---|---|---|---|
| Drug trafficking | $320.0 billion | 2005 UNODC World Drug Report[17] | 10 years |
| Counterfeiting (tangible) | $250.0 billion | 2009 OECD Report[18] | 6 years |
| Human trafficking | $31.6 billion | 2005 ILO Report[19] | 10 years |
| Illicit oil trade | $10.8 billion | 2005 Raymond Baker[20] | 10 years |
| Illicit wildlife trade | $10.0 billion | 2009 Coalition Against Wildlife Trafficking[21] | 6 years |
| Fish | $9.5 billion | 2010 High Seas Task Force Report[22] | 5 years |
| Timber | $7.0 billion | 2009 Seneca Creek report[23] | 6 years |
| Art & cultural property | $6.3 billion | 2010 UN Crime Prevention & Criminal Justice[24] | 5 years |
| Gold (3 countries only) | $2.3 billion | DRC (2010)[25], S. Africa (2008)[26], Peru (2010)[27] | 5-7 years |
| Human organs | $1.2 billion | 2009 for kidney[28], 2007 estimate for liver | 6-8 years |
| Small arms/light weapons | $1.0 billion | 2002 Small Arms Survey estimate [29] | 13 years |
| Diamonds | $0.9 billion | 2009 Kimberley Process Statistics[30] | 6 years |



## II. Emphasizing the role of business in the fight against illicit trade

Illicit trade is becoming increasingly sophisticated, not only in the quality of production and the speed of distribution that can be achieved, but also in criminals' ability to use social networks, online marketplaces, global production chains and the international financial system. Recent developments have raised questions about the extent of responsibility of business for illicit activities conducted either within their platform and operations or within the global production chain. These include:

– **Traditional banks**: Chinese state-owned banks have been named as "conduits"[31] for counterfeiters, while big US banks such as Bank of America, JP Morgan Chase and Wells Fargo have been cited as "financial conduits"[32] for the human smuggling industry.

– **Online marketplaces**: INTERPOL has been coordinating operations with its member states against the online sale of illicit medicines. The result has been the closure of thousands of bogus websites and the seizure of millions of fake medicines. However, online marketplace Alibaba faces pressure from the Chinese government[33] as well as brand owners like Kering[34] to fight the sale of counterfeit goods on its e-commerce platform, and Etsy is facing an investor class-action suit amid allegations it has as many as 2 million items for sale that could be counterfeit or in violation of trademark laws.[35] Iran, meanwhile, is suspected by sanctions officials to have used online marketplaces to build up its nuclear programme.[36] It has been reported that "virtually every dual-use item needed for a proliferator to produce nuclear weapons is advertised for sale on Alibaba".[37]

– **Online advertising**: Google has agreed to pay $250 million to settle a shareholder lawsuit over years-old charges that it knowingly accepted advertisements from illegal online pharmacies[38], while an Internet safety group has accused YouTube[39] of failing to block videos selling stolen credit card data and profiting from legitimate advertisements running beside them. An International Fund for Animal Welfare study into the online trade in endangered animals and animal parts reported finding more than 33,000 animals or parts for sale in more than 9,000 online ads in 280 online marketplaces[40], including Craiglist.[41]

– **Social networks**: People smugglers in North Africa are using Facebook and other social networks to recruit migrants from across the Middle East and Africa.[42]

– **Electronics producers**: The US Securities and Exchange Commission estimates that 6,000 manufacturers and 480,000 suppliers were potentially affected by the 2010 Dodd-Frank Act rules on conflict minerals, but only 1,292 companies filed reports in response.[43]



***Risk, Response, Innovation: Human Trafficking and the Private Sector***

Approximately 21 million men, women, and children are falling prey to human traffickers, according to the International Labour Organization.[69] The ILO further estimates that 68% of these people are victims of labour exploitation, a further 22% are sexually exploited, with the remainder forced to work in prisons or in work imposed by military or rebel forces.[70] With growing profits to be made from trafficking and a low risk of criminal punishment, the indications are that the number of people being trafficked will grow, as criminal groups shift from other forms of illegal trade to human trafficking.[71]

Exploitation of human trafficking victims can take a variety of forms. One of those most often discussed is the sexual exploitation of women and girls. Human trafficking also occurs in the form of forced labour in numerous business sectors, including manufacturing, construction, shrimp harvesting and processing, agriculture, and electronics. In a recent study, the global NGO Verité concluded that 28% of workers in the Malaysian electronics sector were victims of exploitation.[72] In another recent study, Verité also identified and assessed risk factors in global supply chains, including socio-economic, environmental, policy, and political, which create a complex web of vulnerability for workers and industries.

## Counting the cost – why the private sector should be concerned

The human costs, as well as the economic, resource, litigation, and brand and reputation costs of human trafficking, make this something that the private sector needs to address. Traffickers utilize companies to further their exploitation, whether through online recruitment, transport, wire transfers via private financial institutions or hotels and motels as transit sites. Failure to address human trafficking can result in a business inadvertently contributing to a growing illicit economy, as well as risking litigation and a backlash from consumers. Through efforts like the World Economic Forum's Network of Global Agenda Councils Task Force on Human Trafficking and the Meta Council on the Illicit Economy, initiatives are being created to bring issues such as human trafficking to the forefront. In December 2014, the World Economic Forum published *Hedging Risk by Combating Human Trafficking: Insights from the Private Sector*, a report that resulted from a year-long collaboration of the members involved in the Network of Global Agenda Councils Task Force on Human Trafficking. This report included survey-based research in four sectors: financial services, technology, transport, and hospitality and tourism. It concluded with the following analysis and recommendations on the most promising private sector anti-trafficking initiatives and next steps:

1) **Technology and data analysis tools** can be used to identify potential traffickers and track transactions.
2) **Research and collaborative efforts** should be made to promote cross-stakeholder collaboration and public-private partnership, particularly on information sharing and knowledge transfer.
3) **Engagement of senior corporate leaders** can create systemic change throughout a company.
4) **Individuals and employees** can make a difference through raising awareness, and preventing and flagging possible cases of human trafficking.
5) **Best-practice sharing across industries could** foster dialogue and a culture of transparency.
6) **Academic institutions**, particularly business and public-policy schools, have a role to play in training the next generation of business and community leaders in anti-trafficking strategies and entrepreneurial solutions.

The World Economic Forum will be continuing its efforts to build upon this first report and look at innovative private sector approaches to this global human rights abuse. It is critical to work in partnership with business and the licit economy to elevate human freedom on a worldwide scale.

## III. Mapping governance gaps and best practice

In tackling illicit trade, governments are constrained not only by the resources needed to enforce the law but also by having to operate within their own national borders. Governments have a difficult time collaborating with other governments when their laws, policies, and interests vary. At the global level, there is room for better coordination among international organizations, several of which, such as INTERPOL and the World Customs Organization,[31] have limited budgets. It would be beneficial to all players to share innovative approaches and best practice, and to map gaps in governance.

Areas to consider include:

1. *International governance gaps*, which include:

– *Internet*: With an estimated 40,000 to 60,000 illegal sites selling drugs, law enforcers say the web administrator the Internet Corporation for Assigned Names and Numbers (ICANN) should do more to combat this trade; ICANN, however, says its powers are limited.[32]
– *Sea*: International laws prevent enforcement officers from boarding foreign vessels to investigate illegal fishing outside a nation's 200-mile exclusion zone. They can board a ship if they believe it is without nationality, but cannot prosecute over crimes alleged to have taken place beyond their jurisdiction.[33]

2. *Adherence to international protocols and agreements*

– *Illicit tobacco trade*: The World Health Organization's Framework Convention for Tobacco Control (FCTC) entered into force 10 years ago and has been ratified by 180 countries; although FCTC parties adopted a protocol on the illicit tobacco trade in 2012, only six countries have ratified it.[34] *Money laundering*: In the European Union (EU), central registers will be set up listing the beneficiary owners of companies and trusts[35]. Britain, France, Denmark and the Netherlands plan to demand full public disclosure of company beneficiary owners. The deal is awaiting formal sign-off by national governments.[36] These demands go beyond what was agreed by the leaders of the Group of 20 largest economies in November 2014. Meanwhile, the Financial Action Task Force,[37] the global standard-setting body to counter money-laundering and the funding of terrorism, has singled out the countries it says are failing to meet international standards.
– In March 2015, a 2012 Executive Order took effect in the US, requiring government contractors to make sure their supply chains did not include forced labourers.[38]

3. *False invoicing to evade tax must be recognized as part of illicit trade*

The mechanisms used to evade tax tend to be the same as those used to shift the proceeds of other illegal activity across international borders. Keeping records of company ownership, as described above, will help curtail both tax evasion and other aspects of illegal trade. Automatic exchange of tax information across borders is another important tool in combating tax evasion. Country-by-country reporting of financial results by multinational corporations, an issue being addressed by the EU, will also help curb tax evasion. The High Level Panel on Illicit Financial Flows from Africa has identified mis-invoicing for the purpose of commercial tax evasion as by far the major mechanism for shifting money out of the continent, a process which stifles economic prosperity and undermines national and regional security. The panel recommends that all African countries and, by implication, all developing countries, should publish real-time world market trade-pricing data, so that imports and exports can be checked for proper pricing, a move which would significantly reduce tax evasion and, therefore, limit the movement of money from other forms of illegal trade.

4. *Contrasting regulatory regimes and identifying effective practices*

It is illuminating to compare and contrast track-and-trace regulatory regimes across countries and industries.
– *Tobacco*: A comparative analysis of the interventions adopted by countries to control illicit tobacco trade yields not only insights into the array of technological applications and the evolution of policy, but also highlights effectiveness and success rates in different markets.[39]
– *Pharmaceuticals*: Markets such as China, India, South Korea, Brazil, the United States and Europe are in the process of adopting drug traceability regimes. A comparative study looking at the technical requirements in each country, and the pace and scope of implementation, could serve as a guide not only for other countries but also for multinational companies.

5. *Extrapolating stakeholder maps and overlaying alliances*

In addition to mapping the involvement of international organizations, private/business associations and key non-government organizations, it would be beneficial to expand stakeholder maps to reflect the role of non-traditional stakeholders and alliances. For example, on 2 December 2014, Pope Francis and 11 other religious leaders made a united call for an end to slavery by 2020 through education, funding and legal reform.[40] Philanthropists are also playing a more visible role in this space. Bill Gates and Michael Bloomberg, for instance, have created a fund to help countries defend themselves against litigation by tobacco firms.[41]

*6. Identifying areas of regulatory arbitrage*

There are many long-standing examples of regulatory arbitrage, including the sale of "illicit whites"[42] in the underground tobacco industry, but the synthetic drug market is home to some of the most alarming instances of this practice. Laboratory-produced chemical compounds that mimic the effects of popular recreational drugs but that are not yet controlled by international drug conventions are being sold as "legal highs".[43] The rapid emergence of these drugs has forced authorities to play regulatory catch-up to such an extent that the United Kingdom is considering a blanket ban on new psychoactive drugs, rather than banning the drugs one by one.[44] Many of these substances are being produced legally in China[45] and sold cheaply online; in the US, the Drug Enforcement Authority "can't keep up with regulating the drugs, essentially because the research labs in China can change the structure of the chemical and create new versions."[46]

## IV. Harnessing technology to fight illicit trade

Illicit trade has long been considered to be something of a parallel universe, with illegal underground markets for everything that is legitimately sold in the global economy. This is truer today than ever before, with the emergence of illicit e-commerce that is "almost as easy as ordering from Amazon or eBay".[47] In just one year, the number of illegal drug listings on the so-called Dark Web or Dark Net — the anonymous portion of the internet — rose from 20,000 to 47,000.[48] Dark Web marketplaces require specialized technology, software such as Tor, allowing people to browse the web while hiding their identities, and a crypto-currency such as bitcoin that lets them transact their business discreetly.[49] Moreover, these Dark Web sites are innovating, introducing search engines, "trending" searches, user ratings and customer-service buttons.[50]

However, technological innovations are also being harnessed in the fight against illicit trade, and some are showing considerable promise. Examples include:

– *Big data to uncover sex traffickers.* Thomson Reuters Foundation and New York prosecutors worked with financial institutions to use data to uncover sex traffickers.[51]
– *Satellite tracking to tackle illegal fishing.* Backed by the Pew Charitable Trusts, project, Eyes on the Seas, uses a "Virtual Watch Room",[52] a digital platform which monitors waters across the world's oceans and can be accessed remotely by governments.
– *Big data to map deforestation.* To track illegal deforestation, Global Forest Watch was created as an online platform combining satellite images, high-tech data processing and crowd-sourcing, to provide near-real-time data on the world's forests.[53]
– *Drones for monitoring.* Drones can be used not only to monitor environmental crimes but also track illegal mining activities and trafficking of humans, wildlife and drugs.
– *DNA analysis.* DNA analysis is being used to detect food fraud[54] based on a genetic library of all life on Earth. DNA analysis is also being deployed to combat the illegal wildlife trade, with forensic laboratories set up to link stolen ivory to specific animals.[55]



## Conclusion

We believe that the World Economic Forum is the ideal multistakeholder platform to bring together global leaders to improve the effectiveness of policies designed to prevent and mitigate illicit trade.

Some priorities for action:
– If we are to develop a culture of evidence to facilitate informed decision-making across all sectors, then there is a critical need to develop a common or harmonized data base. This has been the number one demand from key stakeholders and participants in this effort. The Forum could play a role here, as an independent, non-partisan and well-respected convener of knowledge and thought leadership.
– Technological solutions are now more cost effective, can be deployed faster and the latest innovations – applications, smartphones and optics – all make traceability feasible at scale. Businesses should employ technologies that allow an appropriate level of information to be shared with the public and law enforcers, so that legitimate products can easily be distinguished from illegitimate products. More broadly, we need to identify the opportunities presented by technology to fight illicit trade.
– We do not have a global governance regime to deal with illicit trade. The closest we have are "initiatives", many of which are, or at some point will be, competing with each other. These include the World Customs Organization (WCO), the Office for Harmonization in the Internal Market, and INTERPOL. Confusion over different organizations' areas of responsibility benefits those involved in illicit trade and, in recognition of this, these three organizations work closely together. Since 2012 they have conducted some 30 joint operational training events and activities, involving 4,000 officers from 85 countries and representing all INTERPOL regions and languages. The WCO has been involved in operations, seminars, mentoring programs, workshops and conferences involving more than 200 stakeholder organizations.

– It is imperative that efforts made by international organizations complement each other and that the focus remains on policy coherence in combating illicit trade. They must also tackle the challenge of aligning fragmented governance with new concepts around the role of business and individuals in the fight against illicit trade.
– By making it clear to governments, businesses and individuals who discover, report and help staunch illicit trade that there are incentives for doing so, we can engage a broader group of stakeholders. Indirect and, where possible, direct financial benefits for those who identify and address illicit activity will encourage involvement.

Governments should support, or be encouraged to support, anti-counterfeiting efforts and the fight against illicit trade, including the FCTC and the World Customs Organization's Interface Public Members (IPM) platform of tools, with appropriate legislation and awareness campaigns. There is also a need to coordinate and update assessments of the magnitude of different types of illicit trade.

The World Economic Forum Meta Council on the Illicit Economy's "Illicit Trade Matrix" should be seen as one of its concrete deliverables. Its aim is to increase the awareness and overall understanding of international, government, institutional, social and private efforts - and their results - in the fight against illicit trade. Ultimately, it is hoped it will stimulate consensus on how to address the many challenges involved and stimulate the creation and implementation of new tools that can effectively and pro actively disrupt illicit networks.



# Deep Dive: Analysis and Recommendations for Controlling the Illicit Mining and Trading of Minerals

*A strategy for limiting or eliminating the contribution of minerals to the illicit economy*

Mining operations within the formal, legal economy can drive growth and development. The illicit mining and trade of minerals can, however, be associated with smuggling, human-rights abuses, environmental destruction and other criminal activities. Solutions to these problems must address the complex interplay of political, social, commercial and economic relationships and drivers that feed the illicit economy. A central challenge is how to alter these relationships, transforming illicit mining operations so they become part of the formal economy, where the rule of law prevails and trade can be legitimized. Transparency, enhanced reporting and accountability, reinforcement of host governments' ability to combat illicit activity, and global advocacy are key elements of the necessary reforms.

Reform measures must be mineral-specific and based on an analysis of specific mineral supply chains. Such measures would span the range of activities from mining through trading to final use, and include safeguards to protect any positive aspects of illicit activity, such as employment. Most measures will focus on Artisanal and Small Mines (ASMs), but will also include guiding principles for large-scale mines, mainly regarding trade.

## The ASM Matrix – a risk map for the illicit trade in minerals

Mapping the illicit mining and trade in minerals will support targeted intervention. Recognizing that some minerals cannot be mined or traded illegally because of the scale of investment required, a first step is to identify those whose operations can be undertaken clandestinely. Such a map will cover two distinct mineral categories: precious minerals such as diamonds, gold and rubies, and minerals that require very low capital investment and skill to extract, such as tantalum ores and tin. The map would focus on regions of concern where conditions are most likely to support illicit activity and where certain target minerals are present. It would identify areas of risk for conflict between ASMs and larger scale mining (LSM). The supply and value chain of each target metal can be captured as part of a database.

**Annex 1** is a table that offers an example of how this information could be organized. It would inform, expose and reveal pressure points for focused attention and action. A major data gathering exercise is envisaged. It would need a host, such as the World Economic Forum, the Organisation for Economic Cooperation and Development (OECD) or another multi-sector initiative, and should be updated periodically. Protocols, legal safeguards and other administrative arrangements will have to be worked out. This map would form a basis for a global situation analysis. This would help identify appropriate actions for the control of the illicit mineral trade and its migration to the formal economy.



### Reform measures

A combination of measures would focus on the pressure points identified on the map. Some of the instruments that could be used are:

– **Certificates and supply-chain assurance for refiners**. Notwithstanding the limitations of track-and-trace mechanisms for certain minerals, assurance systems, such as those using refiner certificates, can bring transparency to supply chains. They can also help target illicit operations, particularly when aimed at key pinch points. A focus on refiners and smelters has proven an effective strategy, allowing downstream companies to know they are sourcing from trusted partners.

– **Legitimate trading, processing and training centres**. Processing, trading and training centres could be introduced in target regions, fuelling development and functioning as a choke point in the way that refiners do. These centres would be accredited by an outside authority to ensure compliance, and training and skills development would be offered. This strategy can shorten the supply chain, bringing more financial value to miners in exchange for the required paperwork. Such centres would also serve as hubs of legal activity, attracting legitimate ASMs.

– **End-user pressure and incentives, including certification**. End-users can play a critical role in raising demand and support for the licit trade in minerals. For jewellery, a water-marked certificate could be designed to accompany all sales of precious stones and gold to consumers. Similarly, dealers and processors such as diamond cutters could be recognized for dealing only in certified stones or gold. Later, individual countries could issue assurance certificates for all sites and sales, and downstream technology companies could assure consumers that they know their minerals do not contribute to conflict. Certification can also bring value to ASM communities and reward better practices, through initiatives such as "development diamonds" and "fair mined jewellery".

– **Transparency and Advocacy Initiative on ASM (TASM)**. Lessons from the Extractive Industries Transparency Initiative (EITI) and the African Peer Review Mechanism (APRM) suggest that a permanent system of advocacy at local and international levels against illicit mining and trading will bring value. A key tool will be the ASM Matrix on illicit minerals (see Annex 1). Regular publication of country-based reports and maps would be combined with widespread publicity to garner global support. Publicity and advocacy would provoke debate and pressure. TASM would be a constructive public and private partnership. Participating countries, companies and organizations would be incentivized to be good actors. Further work is required to determine how and where to initiate and host this measure.

– **Transparency and EITI-type reporting**. The early EITI approach targeted discrepancies between disbursements by companies and official receipts held by the public treasury. This had significant benefits, one of which was increasing awareness of the business money trail. Building on this approach, one possibility would be to oblige all buyers of unprocessed minerals in host countries to disclose their sources of supply, without compromising commercial confidentiality. Voluntary corporate reporting standards could be considered. More detailed home-government reports on volumes and source of imports would be a good starting point.

– **Country case studies and policy reform**. A set of case studies informed by the Matrix and identified by TASM could be established, beginning with countries known to harbour significant illicit mining operations. These could help determine the right combination of tax, market and public-sector incentives to convert illicit entities to formal structures. These case studies would examine the adequacy of legal frameworks, institutional arrangements and overall governance controls. Local knowledge would provide information that could be confirmed using modern technology such as electronic maps, drones and geographic information systems. Harmonizing tariffs on minerals between neighbouring countries would discourage smuggling, which is especially prevalent in Africa. Global action would help to dismantle markets for ores that have been mined illegally.

– **Capacity-building, trade sanctions and development partners**. Capacity-building and donor prioritization would be used to strengthen host-country capacity to enforce laws and regulations in order to retain mining operations within the formal economy. Building on learnings from experience in other markets, sanctions should be designed that are practical and easily monitored. It is important to avoid sanctions that would drive operations back to the illicit economy. Complementary measures would include incentives for ASM miners, such as free services through training and trading centres, which would draw them into the formal economy.

– **Harmonization of international protocols and tools for minerals from conflict zones**. The incentives for illicit activities are probably highest in conflict zones. Here, the adoption of protocols to be observed globally, such as those developed by the OECD, is a good way forward. Harmonization should be sought across both policy tools and voluntary initiatives, such as the World Gold Council conflict-free tool. This would support adoption by host and trading countries, as well as companies in mineral supply chains.

– **Alternative and supplementary livelihoods**. This is arguably the most difficult of areas to address, but there are lessons from the experience of the coca farmers of Latin America that can be customized for the minerals sector. Admittedly, farming, the obvious alternative to mining, is sometimes unattractive to those undertaking ASM activity. There is no immediate return, workers tend to be subject to traditional hierarchical controls, regular revenues are absent and farmers must await harvest for income, and missing is the gambler's possibility of windfall returns. Nevertheless, there are success stories, and these should serve as models for pilot programmes. Donor coordination to support these strategies is critical.

– **Clean ASM Finance Fund**. ASM miners are sometimes lured into the illegal economy because of the availability of finance provided by the illicit sector. A Clean ASM Finance Fund could be established and tested in target regions to help break this link.

– **LSM-ASM intervention experts**. Given that they are increasingly working in the same regions, conflicts between LSMs and ASMs are likely to increase. With the demise of the World Bank's Communities And Small Scale Mining (CASM) programme, there is now a gap in expertise and research. It is time to re-establish a global network of accredited experts who can address LSM-ASM conflicts.

– **Upstream data-gathering and ASM-to-market pilots**: We should encourage technological innovation to support data gathering on ASM miners and sources. Where possible, this data should be linked to mid- and up-stream data sets and reform initiatives, including those incentivizing participation in ethical product markets.

Finally, we see a world where technology, big data and transparency will combine to enable consumers to use their smartphones to support ethical buying.

Conclusion—the way forward

We recommend the following:

– The World Economic Forum, OECD and RESOLVE's Public Private Alliance for Responsible Minerals Trade should organize an international experts' meeting to prioritize and develop an action plan. This should include discussion on the design and launch of TASM, promote donor coordination, and support harmonization of law and voluntary instruments.

– The ASM Matrix should be designed and launched.

– A working group should be set up to define and extend the current transparency architecture, focused on promoting licit minerals, such as the CFSP and WGC. This would have a mandate to build an interactive information or data-sharing platform on illicit operations in minerals, including LSM.



# Annex 1. Value Chain Matrix for Tantalum Ores

| Source countries (b) | Centres | | | Potential pressure points | | | | |
|---|---|---|---|---|---|---|---|---|
| | Concentrating (c-1) | Exporting (c-2) | Processing (Refining) (c–3) | Mining[1] (d) | Transport[2] (e) | Trade (f) | Processing (Refining) (g) | End User/ Retailer (h) |
| DRC Rwanda Burundi Rep. Congo | DRC* Rwanda Burundi Rep. Congo | DRC* Tanzania South Africa | China US | | | | | |
| Brazil | Brazil | Brazil | China US | | | | | |
| Columbia | Columbia | Columbia | China US | | | | | |
| Australia | Australia | Australia | China US | | | | | |

**Known Uses:** Capacitors, super alloys, etc.
**Destinations:** (primary known use product producer locations) USA, EU, China, etc.
* known illicit transfers out of country for prior to and after concentrating steps occur

(Footnotes)
[1] Information on precise locations and who are involved (Women, children, youths, Illegal armed groups)
[2] Illegal agents, shipping companies, uncertified movements

# Endnotes

1. ICC-BASCAP study done by Frontier Economics http://www.iccwbo.org/Advocacy-Codes-and-Rules/BASCAP/BASCAP-Research/Economic-impact/Global-Impacts-Study/

2. World Trade Organization Press Release, 14 April 2015 https://www.wto.org/english/news_e/pres15_e/pr739_e.htm

3. United Nations News Service, 31 May 2015 http://www.un.org/apps/news/story.asp?NewsID=51010#.VXvL2ut0afQ

4. A study from a special issue of the American Journal of Tropical Medicine and Hygiene published April 2015 as cited in the New York Times edition, "Stemming the Tide of Fake Medicines," 18 May 2015 http://www.nytimes.com/2015/05/18/opinion/stemming-the-tide-of-fake-medicines.html

5. International Policy Network Link, cited in UN's Africa Renewal May 2013 http://www.un.org/africarenewal/magazine/may-2013/counterfeit-drugs-raise-africa%E2%80%99s-temperature

6. International Policy Network Link, cited in UN's Africa Renewal May 2013 http://www.un.org/africarenewal/magazine/may-2013/counterfeit-drugs-raise-africa%E2%80%99s-temperature

7. May 2014 report of ILO Link; also cited in BBC News, 20 May 2014 "Forced labour 'making $150bn profit' - ILO report" http://www.bbc.com/news/world-europe-27480896

8. World Bank, "Labour Force Total," 2014 http://data.worldbank.org/indicator/SL.TLF.TOTL.IN/countries

9. National Post, "Mark Vlasic: Illicit trade in looted antiquities helps finance ISIS terror network," 15 September 2014, http://news.nationalpost.com/full-comment/mark-vlasic-illicit-trade-in-looted-antiquities-helps-finance-isis-terror-network

10. BBC News, "Islamic State and the 'blood antique' trade," 2 April 2015 http://www.bbc.com/culture/story/20150402-is-and-the-blood-antique-trade

11. United Nations Environment Programme and Interpol, "The Environmental Crime Crisis" 2014, http://www.unep.org/unea/docs/RRAcrimecrisis.pdf also cited in VICE News 26 June 2014, "The Illicit Wildlife and Resource Trade Is Financing Militias and Terrorists" https://news.vice.com/article/the-illicit-wildlife-and-resource-trade-is-financing-militias-and-terrorists

12. OECD press release 8 April 2015, http://www.oecd.org/dac/stats/documentupload/ODA%202014%20Technical%20Note.pdf

13. The Guardian, "$213bn illegal wildlife and charcoal trade 'funding global terror groups'," 24 June 2014 http://www.theguardian.com/environment/2014/jun/24/illegal-wildlife-charcoal-trade-funding-global-terror-groups

14. United Nations Office on Drugs & Crime, "Estimating illicit financial flows resulting from drug trafficking and other transnational organized crimes," (2011) https://www.unodc.org/documents/data-and-analysis/Studies/Illicit_financial_flows_2011_web.pdf

15. An example is the World Customs Organization's press release for its first "Illicit Trade Report" referencing the GAC on Illicit Trade http://www.wcoomd.org/en/media/newsroom/2013/june/wco-publishes-its-first-illicit-trade-report.aspx

16. Global Agenda Council on Illicit Trade & Organized Crime 2012-2014 http://www3.weforum.org/docs/GAC/2013/Connect/WEF_GAC_Illicit_Trade_and_Organized_Crime_2012-2014_Connect.pdf

17. United Nations Office on Drugs and Crime, "World Drug Report," 2010: 12, accessed October 1, 2010. http://www.unodc.org/documents/wdr/WDR_2010/World_Drug_Report_2010_lo-res.pdf

18. OECD "Magnitude of Counterfeiting and Piracy of Tangible Products: An Update."

19. Belser, Patrick, "Forced Labour and Human Trafficking: Estimating the Profits," ILO, March 2005.

20. Baker, Raymond, "Capitalism's Achilles Heel: Dirty Money and How to Renew the Free-Market System" (Hoboken: Wiley, 2005), 167.

21. GFI Interview with Hollis Cummers, Coalition Against Wildlife Trafficking (CAWT) Director, June 12, 2009

22. High Seas Task Force, "Closing the net: Stopping illegal fishing on the high seas," Governments of Australia, Canada, Chile, Namibia, New Zealand, and the United Kingdom, WWF, IUCN and the Earth Institute at Columbia University (2006): 18 http://www.illegal-fishing.info/uploads/HSTFFINAL.web.pdf.

23. "'Illegal' Logging and Global Wood Markets: The Competitive Impacts on the U.S. Wood Products Industry." Seneca Creek Associates, LLC and Wood Resources International (November 2009) pg. 4, http://www.illegal-logging.info/uploads/%20afandpa.pdf

24. Idriss, Manar, Manon Jendly, Jacqui Karn, and Massimiliano Mulone, "International Report on Crime Prevention and Community Safety: Trends and Perspectives," International Centre for the Prevention of Crime, 2010, pg. 52.

25. "The Globalization of Crime: A Transnational Organized Crime Threat Assessment," United Nations Office on Drugs and Crime (2010) p. 263, accessed September 22, 2010, http://www.unodc.org/documents/data-and-analysis/tocta/11.Regions_under_stress.pdf

26. Hurd, Emma, "Sky Exclusive: Cops And Gold Smugglers," Sky News, February 27, 2008.

27. Morante, Thor, "Illegal gold mining destroying Peru's Madre de Dios jungle."

28. Interlandi, Jeneen, "Not Just Urban Legend," Newsweek, January 10, 2009

29. Stohl, Rachel, "Fighting the Illicit Trafficking of Small Arms," Center for Defense Information (13 May 2005)

30. "Annual Summary Charts: 2008," Kimberley Process: Rough Diamond Statistics. Kimberley Process.

31. Los Angeles Times (Associated Press), "Chinese banks a haven for Web counterfeits," 11 May 2015 http://www.latimes.com/business/la-fi-china-banks-counterfeiting-20150511-story.html

44. Interpol has an annual budget of roughly $75 million, which was increased through donations from the tobacco industry.

32. Bloomberg, 16 January 2015, "One Thing Gangs Smuggling Latin Migrants Over the Border Can't Do Without: Big U.S. Banks," http://www.bloomberg.com/news/articles/2015-01-16/one-thing-gangs-smuggling-latin-migrants-over-the-border-can-t-do-without-big-u-s-banks

45. Wall Street Journal, 1 April 2015 "China Tries to Clean Up E-Commerce" http://www.wsj.com/articles/china-tries-to-clean-up-e-commerce-1427894413

34. Reuters, 16 May 2015, "Alibaba sued in U.S. by luxury brands over counterfeit goods," http://www.reuters.com/article/2015/05/16/us-alibaba-lawsuit-fake-idUSKBN0OO2E120150516

35. Bloomberg, 16 May 2015, "Etsy Counterfeit Problems Grow as Investors Allege Fraud," http://www.bloomberg.com/news/articles/2015-05-15/etsy-counterfeit-problems-grow-as-investors-allege-fraud

36. Bloomberg, 6 May 2015, "Nuclear Smugglers Abusing Alibaba Listings Challenge Iran Deal," http://www.bloomberg.com/news/articles/2015-05-05/nuclear-smugglers-abusing-alibaba-listings-challenge-iran-deal

37. Financial Times, 26 September 2014, "Alibaba: Weapons of mass ecommerce," http://www.ft.com/intl/cms/s/0/2a19e07c-43ef-11e4-8abd-00144feabdc0.html

38. Wall Street Journal, 17 November 2014, "Google to Spend $250 Million to Boost Ad Compliance Plan," http://www.wsj.com/articles/google-to-spend-250-million-to-boost-ad-compliance-plan-1416229758

39. Bloomberg, 24 July 2014, "Google Targeted in State Crackdown on Illicit Drug Ads," http://www.bloomberg.com/news/articles/2014-07-24/google-targeted-in-state-crackdown-on-illicit-drug-ads

40. Bloomberg, 28 November 2014, "China's Web Stimulates Illegal Trade in Endangered Species," http://www.bloomberg.com/bw/articles/2014-11-28/buy-and-sell-endangered-species-on-the-chinese-internet

41. IFAW Report, "Elephant vs Mouse: An investigation of the Ivory Trade on Craigslist," 2015 http://www.ifaw.org/sites/default/files/IFAW-craigslist-ivory-report-2015.pdf

42. The Telegraph, 9 December 2014, "People smugglers using Facebook to recruit migrants," http://www.telegraph.co.uk/news/worldnews/europe/italy/11282264/People-smugglers-using-Facebook-to-recruit-migrants.html

43. Financial Times, 21 October 2014 "IT and the trade in conflict minerals," http://www.ft.com/intl/cms/s/0/34c46212-4f99-11e4-908e-00144feab7de.html

33. Wall Street Journal, 27 October 2014, "Icann, Regulators Clash Over Illegal Online Drug Sales," http://www.wsj.com/articles/icann-regulators-clash-over-illegal-internet-drug-sales-1414463403

46. The Australian, 24 April 2015, "Casting a wide net for criminals," http://www.theaustralian.com.au/news/features/casting-a-wide-net-for-criminals/story-e6frg6z6-1227317775501

47. Council on Foreign Relations, 27 February 2015, "The Tobacco Treaty Turns 10" http://www.cfr.org/health-policy-and-initiatives/tobacco-treaty-turns-ten/p361922cid=rss-analysisbriefbackgroundersexp-the_tobacco_treaty_turns_ten-022715

48. Reuters, 17 December 2014, "EU shines light on dirty money with central registers," http://www.reuters.com/article/2014/12/17/eu-moneylaundering-lawmaking-idUSL6N0U11HZ20141217

49. Wall Street Journal, 17 December 2014, "EU Moves to Counter Money Laundering," http://www.wsj.com/articles/eu-rules-to-require-listing-of-company-owners-on-national-registers-1418825431

50. Financial Action Task Force, 24 October 2014, "High Risk and non-cooperative jurisdictions" Public Statement http://www.fatf-gafi.org/topics/high-riskandnon-cooperativejurisdictions/documents/public-statement-oct2014.html

51. Wall Street Journal, Risk & Compliance blog, 30 March 2015, "Supply Chain Slavery Comes Into Focus for Companies," http://blogs.wsj.com/riskandcompliance/2015/03/30/supply-chain-slavery-comes-into-focus-for-companies/

52. Hana Ross, "Controlling Illicit Tobacco Trade: International Experience." Economics of Tobacco Control Project, 28 May 2015 http://tobacconomics.org/wp-content/uploads/2015/05/Ross_International_experience_05.28.15.pdf

53. Reuters, 2 December 2014, "World religious leaders pledge to fight modern slavery," http://blogs.reuters.com/faithworld/2014/12/02/world-religious-leaders-pledge-to-fight-modern-slavery/

54. Reuters, 18 March 2015, "Gates and Bloomberg create $4 million fund to fight Big Tobacco," http://www.reuters.com/article/2015/03/18/us-health-tobacco-fund-idUSKBN0ME24C20150318

55. "Illicit whites are cigarettes that may be produced legally but, as KPMG puts it, are "typically not sold legally anywhere and are often made exclusively for smuggling" as cited in BBC News, 23 January 2015, "The cigarettes that worry tobacco firms," http://www.bbc.com/news/blogs-magazine-monitor-30949434

56. AFP/Business Insider 26 May 2015, "Meth consumption in Asia is booming as wealth rises" http://www.businessinsider.com/afp-meth-seizures-quadruple-across-much-of-asia-pacific-un-2015-5

57. The Telegraph, 27 May 2015, "Blanket ban on 'legal highs' will see dealers face seven years in jail" http://www.telegraph.co.uk/news/politics/queens-speech/11633825/Blanket-ban-on-legal-highs-will-see-dealers-face-seven-years-in-jail.html

58. The Guardian, 1 May 2015, "'Our purity is above 99%': the Chinese labs churning out legal highs for the west," http://www.theguardian.com/society/2015/may/01/chinese-labs-legal-highs-west-drugs

59. Tech.Mic 27 May, 2015, "It's Ridiculously Easy to Buy Flakka, the New Street Drug That's Devastating Florida," http://mic.com/articles/119280/it-s-ridiculously-easy-to-buy-flakka-the-new-street-drug-that-s-devastating-florida

60. Washington Post Wonkblog, 24 November 2014, "The not-so-secret place on the Web that sells drugs, uranium…"http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/22/a-complete-tally-of-the-weird-disturbing-and-hilarious-things-for-sale-on-the-internets-largest-black-market/

61. Wired, 27 October 2014, "NY Senator calls for renewed crackdown on dark web drug sales," http://www.wired.com/2014/10/schumer-crackdown-on-dark-web-drug-sales/

62. Economist, 1 November 2014, "The Amazons of the dark net," http://www.economist.com/news/international/21629417-business-thriving-anonymous-internet-despite-efforts-law-enforcers

63. The Guardian, 5 October 2014, "Dark net markets: the eBay of drug dealing," http://www.theguardian.com/society/2014/oct/05/dark-net-markets-drugs-dealing-ebay

64. Reuters, 18 November 2014, "US data war on sex trafficking to reach Europe," http://www.reuters.com/article/2014/11/18/women-conference-vance-idUSL6N0T74AB20141118

65. Economist, 24 January 2015, "Combating Illegal Fishing: Dragnet," http://www.economist.com/news/science-and-technology/21640306-new-satellite-based-surveillance-system-will-keep-sharp-eye-those

66. The Guardian, 2 October 2014, "Counting trees to save the woods," http://www.theguardian.com/global-development-professionals-network/2014/oct/02/counting-trees-to-save-the-woods-using-big-data-to-map-deforestation

67. Scientific American, 4 February 2014, "Quick DNA Scans Could Ensure Food Is Safe to Eat," http://www.scientificamerican.com/article/quick-dna-scans-could-ensure-food-is-safe-to-eat/

68. BBC 8 May 2015, "Kenya opens anti-poaching forensic laboratory," http://www.bbc.com/news/world-africa-32651578

69. The ILO states in their 2012 study's executive summary that "human trafficking can also be regarded as forced labour," and the 20.9 million "estimate captures the full realm of human trafficking for labour and sexual exploitation or what some call 'modern-day slavery.'" This figure does not include trafficking for organ removal and forced marriage/ adoption unless leading to forced labour and sexual exploitation. International Labour Organization, "Global estimate of forced labour: Executive summary," 2012, pg. 1. http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_182004.pdf

70. Ibid.

71. Shelley, L., Human Trafficking: A Global Perspective, Cambridge University Press, 2010.

72. Verité, "Forced Labor in the Production of Electronic Goods in Malaysia: A Comprehensive Study of Scope and Characteristics," 2014. http://www.verite.org/sites/default/files/images/VeriteForcedLaborMalaysianElectronics_2014_0.pdf

73. Verité, "Strengthening Protections Against Trafficking in Persons in Corporate and Federal Supply Chains," 2015. http://www.verite.org/sites/default/files/images/Verite-Executive_Order_13627.pdf

## Members of Meta-Council on the Illicit Economy

**Adam Blackwell** (Chair)
Ambassador in residence, William J. Perry Center for Hemispheric Defense and Security Studies (NDU), National Defense University, USA

**Christina Bain**
Director, Initiative on Human Trafficking and Modern Slavery, Babson College

**Jay Cziraky**
Chief Executive Officer, North Degrees

**Raymond Baker**
President, Global Financial Integrity

**Steven Simske**
HP Fellow and Director, Content Solutions, Hewlett-Packard Company

**Steven Broad**
Executive Director, TRAFFIC International

**Gaozhang Zhu**
Director, Compliance and Facilitation, World Customs Organization (WCO)

**Hans J. Schwab**
Managing Director, Tech Trace SA

**Linah K. Mohohlo** (Vice-Chair)
Governor and Chairman of the Board, Bank of Botswana

**Dimitri Vlassis**
Chief, Corruption and Economic Crime Branch (UNODC), United Nations Office on Drugs and Crime

**Anton Plessis**
Managing Director, Institute for Security Studies (ISS)

**Wolfgang Goetz**
Director, European Monitoring Centre for Drugs and Drug, Addiction (EMCDDA)

**Rolf Alter**
Director, Public Governance and Territorial Development, Organisation for Economic Co-operation and Development (OECD)

**Laura Lane**
President, Global Public Affairs, UPS

**Jean-Paul Laborde**
Executive Director, Counter- Terrorism Executive Directorate (CTED), United Nations

**Alan D. Cohn**
Adjunct Professor, Georgetown University Law Center

**Ashifi Gogo**
Chief Executive Officer, Sproxil

**Paul Boon Hui Khoo**
Senior Adviser, Ministry of Home Affairs of Singapore

## World Economic Forum

**Jean-Luc Vez**
Managing Director, Head of Public Security Policy and Security Affairs Member of the Management Committee, World Economic Forum

**Karen Wong**, Council Manager of Meta-Council on the Illicit Economy
Community Specialist, Global Crime and Public Security, World Economic Forum



COMMITTED TO
IMPROVING THE STATE
OF THE WORLD

The World Economic Forum
– committed to improving the
state of the world – is the
International Organization for
Public-Private Cooperation.

The Forum engages the
foremost political, business and
other leaders of society to shape
global, regional and industry
agendas.

World Economic Forum
91–93 route de la Capite
CH-1223 Cologny/Geneva
Switzerland

Tel.: +41 (0) 22 869 1212
Fax: +41 (0) 22 786 2744

contact@weforum.org
www.weforum.org